## BLAKE *v.* McCLUNG.

ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

No. 6.  Submitted November 8, 1897. — Decided December 12, 1898.

Chapter 31 of the acts of Tennessee of 1877, entitled "An act to declare the terms on which foreign corporations organized for mining or manufacturing purposes may carry on their business, and purchase, hold and convey real and personal property in this State," provided that corporations organized under the laws of other States and countries, for purposes named in the act, might carry on within that State the business authorized by their respective charters, but that "creditors who may be residents of this State shall have a priority in the distribution of assets, or subjection of the same, or any part thereof, to the payment of debts over all simple contract creditors, being residents of any other country or countries, and also over mortgage or judgment creditors, for all debts, engagements and contracts which were made or owing by the said corporations previous to the filing and registration of such valid mortgages, or the rendition of such valid judgments." *Held,* that, as the litigation proceeded on the theory that plaintiffs in error were citizens of Ohio, where they resided, did business, and had offices, that question could not now be considered; and as the manifest purpose of the act was to give to all Tennessee creditors priority over all creditors residing out of that State, without reference to the question whether they were citizens or only residents in some other State or country, the act must be held to infringe rights secured to the plaintiffs in error, citizens of Ohio, by the provision of Sec. 2 of Art. IV of the Constitution declaring that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States, although, generally speaking, the State has the power to prescribe the conditions upon which foreign corporations may enter its territory for purposes of business.

It is not in the power of one State, when establishing regulations for the conduct of private business of a particular kind, to give its own citizens essential privileges, connected with that business, which it denies to citizens of other States.

When the general property and assets of a private corporation, lawfully doing business in a State, are in course of administration by the courts

of said State, creditors who are citizens of other States are entitled, under the Constitution of the United States, to stand upon the same plane with creditors of like class who are citizens of such State, and cannot be denied equality of right simply because they do not reside in that State, but are citizens residing in other States of the Union.

While the members of a corporation are, for purpose of suit by or against it in the courts of the United States, to be conclusively presumed to be citizens of the State creating it, the corporation itself is not a citizen within the meaning of the provision of the Constitution that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States.

The said statute of Tennessee, so far as it subordinates the claims of private business corporations not within the jurisdiction of that State (although such private corporations may be creditors of a corporation doing business within the State under the authority of that statute) to the claims against the latter corporation of creditors residing in Tennessee, is not a denial of the equal protection of the laws secured by the Fourteenth Amendment to persons within the jurisdiction of the State, however unjust such a regulation may be deemed.

THE case is stated in the opinion.

*Mr. Heber J. May* and *Mr. Tully R. Cornick* for plaintiffs in error.

*Mr. John W. Green* for defendants in error.

*Mr. Henry H. Ingersoll* for Clarke & Reid.

*Mr. Charles Seymour* for the London Trust Company.

MR. JUSTICE HARLAN delivered the opinion of the court.

This writ of error brings up for review a final judgment of the Supreme Court of Tennessee sustaining the validity of certain provisions of a statute of that State passed March 19, 1877, c. 31.

The chief object of the statute was declared to be to secure the development of the mineral resources of the State and to facilitate the introduction of foreign capital. § 7.

It provides, among other things, that "corporations chartered or organized under the laws of other States or countries, for the purpose of mining ores or coals, or of quarrying stones

or minerals, of transporting the same, or erecting, purchasing or carrying on works for the manufacture of metals, or of any articles made of or from metal, timber, cotton or wool, or of building dwelling houses for their workmen and others, or gas works, or water works, or other appliances designed for the promotion of health, good order or general utility, in connection with such mines, manufactories and dwelling houses, may become incorporated in this State, and may carry on in this State the business authorized by their respective charters, or the articles under which they are or may be organized, and may enjoy the rights and do the things therein specified, upon the terms and conditions, and in the manner and under the limitation herein declared." § 1.

The second section provides for the filing in the office of the Secretary of State by " each and every corporation created or organized under or by virtue of any government other than that of this State, of the character named in the first section of this act, desiring to carry on its business" in the State, of a copy of its charter or articles of association, and the recording of an abstract of the same in the office of the register of each county in which the corporation proposes to carry on its business or to acquire any lands. § 2.

The third section declares that " such corporations shall be deemed and taken to be corporations of this State, and shall be subject to the jurisdictions of the courts of this State, and may sue and be sued therein in the mode and manner that is, or may be, by law directed in the case of corporations created or organized under the laws of this State." § 3.

The fifth section provides:

"§ 5. That the corporations, and the property of all corporations coming under the provisions of this act, shall be liable for all the debts, liabilities and engagements of the said corporations, to be enforced in the manner provided by law, for the application of the property of natural persons to the payment of their debts, engagements and contracts. Nevertheless, creditors who may be *residents of this State* shall have a *priority in the distribution of assets*, or subjection of the same, or any part thereof, to the payment of debts over all simple

contract creditors, being residents of *any other country or countries*, and also over mortgage or judgment creditors, for all debts, engagements and contracts which were made or owing by the said corporations previous to the filing and registration of such valid mortgages, or the rendition of such valid judgments. But all such mortgages and judgments shall be valid, and shall constitute a prior lien on the property on which they are or may be charged as against all debts which may be incurred subsequent to the date of their registration or rendition. The said corporations shall be liable to taxation in all respects the same as natural persons resident in this State, and the property of its citizens is or may be liable to taxation, but to no higher taxation, nor to any other mode of valuation, for the purpose of taxation; and the said corporations shall be entitled to all such exemptions from taxation which are now or may be hereafter granted to citizens or corporations for the purpose of encouraging manufacturers in this State, or otherwise." Acts of Tennessee 1877, p. 44.

The case made by the record is substantially as follows:

The Embreeville Freehold Land, Iron and Railway Company, Limited — to be hereafter called the Embreeville Company — was a corporation organized under the laws of Great Britain and Ireland for mining and manufacturing purposes. In 1890 it registered its charter under the provisions of the above statute, and established a manager's office in Tennessee. It purchased property and did a mining and manufacturing business there, transacting its affairs in this country at and from its Tennessee office.

On the 20th day of June, 1893, C. M. McClung & Co. and others filed an original general creditors' bill in the Chancery Court of Washington County, Tennessee, against this company and others, alleging its insolvency and default in meeting and discharging its current obligations; charging that it had made a conveyance in trust of certain personal property in fraud of the rights of its other creditors, and asking the appointment of a receiver and the administration of its affairs as an insolvent corporation. The court took jurisdiction of the corporation, sustained the bill as a general creditors' bill, appointed

a receiver of its property in Tennessee, administered its affairs in that State, and passed a decree adjudicating the rights and priorities of certain creditors.

No question is made in respect to the amount due to any one of the creditors whose claims were presented.

The company maintained its home office in London, its managing director resided there, and after this suit was instituted liquidation under the Companies' Acts of Great Britain was there ordered and begun.

There were holders of debentures executed by the British company whose claims were not specifically adjudicated in the decree below. The original debenture issue amounted to $500,000, and another issue, subsequent in time, and in respect of which priority in right was claimed, amounted to $125,000. All the holders of those issues are non-residents of Tennessee and of the United States. There was also a general trade indebtedness aggregating about $90,000 due by the company to residents of Great Britain. Those claims were specifically adjudicated by the decree.

Among the creditors of the company at the time this suit was instituted were the plaintiffs in error, namely: C. G. Blake, whose residence and place of business was in Ohio; Rogers, Brown & Company, the members of which also resided in Ohio and carried on business in that State; and the Hull Coal & Coke Company, a corporation of Virginia. In the intervening petitions filed by those creditors it was averred that the plaintiffs in the general creditor's bill, residents of Tennessee, claimed priority of right in the distribution of the assets of the insolvent corporation over other creditors of the corporation " citizens of the United States, but not of the State of Tennessee;" and that the said statute was unconstitutional so far as it gave preferences and benefits to the plaintiffs or other citizens of Tennessee over the petitioners or other citizens of the United States.

By the final decree of the Chancery Court of Washington County, it was, among other things, adjudged that the act of 1877 was constitutional; that all of the creditors of the Embreeville Company residing in Tennessee were entitled to *priority*

of satisfaction out of its assets (after the payment out of the proceeds of the real estate of the claim of the Pittsburgh Iron & Steel Engineering Company) as against its other creditors who were "residents and *citizens of other States* of the United States or other countries;" that the creditors who were "*citizens of other States* of the United States, and who contracted with the company as located and doing business in Tennessee, are entitled to share ratably in its assets, being administered in this cause next after the payment of the Pittsburgh Iron & Steel Engineering Company *and the Tennessee creditors.*"

Upon appeal to the Chancery Court of Appeals the decree of the Chancery Court was reversed in certain particulars. In the findings of the Chancery Court of Appeals it was stated that the Chancery Court of Washington County adjudged, among other things, that "under the act of 1877 (which was adjudged constitutional) all the creditors of said Embreeville Company residing in Tennessee are entitled to priority of satisfaction out of the assets of the Embreeville Company (after the payment out of the proceeds of the real estate of the claim of the Pittsburgh Iron & Steel Engineering Co.) as against the other creditors of said company who are non-residents and citizens of other States of the United States or other countries; that the other creditors of the Embreeville Company who are *citizens of other States of the United States*, and who contracted with the said Embreeville Company as located and doing business in the State of Tennessee, are entitled to share ratably in the assets of the defendant Embreeville Company being administered in this cause after the payment of the Pittsburgh Iron & Steel Engineering Company and the Tennessee creditors (except the coke stopped *in transitu*)." And the decree in the Chancery Court of Appeals contained, among other provisions, the following: "That all of the holders and owners of the debenture bonds of the company are simple contract creditors of said company, and stand upon the same footing in reference to the distribution of the assets of the company as all other of its creditors residing out of the State of Tennessee;" and that "the portion of the chancellor's decree giving priority of payment to such of the creditors of

said company who reside in the United States of America, but not in the State of Tennessee, and to such creditors now residents of Tennessee who dealt with the company in relation to its Tennessee office, over all alien creditors of said company, be, and the same is hereby, reversed, it being here adjudged that all the creditors of said company residing out of the State of Tennessee must share equally and ratably in the distribution of the funds of said company *after the Tennessee creditors shall have been paid in full.*"

The cause was carried to the Supreme Court of Tennessee, and so far as the plaintiffs in error are concerned was heard in that court upon appeal from the Chancery Court of Appeals, as well as upon writs of error to the Chancery Court.

It was adjudged by the Supreme Court of the State that the act of March 19, 1877, was in all respects a valid enactment, and not in contravention of paragraph 2 of Article IV or of the Fourteenth Amendment of the Constitution of the United States, nor in contravention of any other provision of the National Constitution ; that all of the holders and owners of the debenture bonds of the Embreeville Company were ·simple contract creditors of the company, and stood upon the same footing with reference to the distribution of its assets as all of its other creditors who " reside out of the State of Tennessee," whether they be residents of other States or of the Kingdom of Great Britain ; that all of the creditors of the · Embreeville Company " who resided in the State of Tennessee " are entitled to priority of payment out of all of the assets of said company, both real and personal, over all of the other creditors of said company who do not reside in the State of Tennessee, whether they be residents of other States of the United States or of the Kingdom of Great Britain ; that all of the creditors of the Embreeville Freehold Land, Iron & Railway Company who reside out of the State of Tennessee, whether they reside in other States of the United States or in the Kingdom of Great Britain, have the right and must share equally and ratably in the distribution of said funds of the said company after the residents of the State of Tennessee shall have been first paid in full.

The plaintiffs in error contend that the judgment of the state court, based upon the statute, denies to them rights secured by the second section of the Fourth Article of the Constitution of the United States providing that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States," as well as by the first section of the Fourteenth Amendment, declaring that no State shall " deprive any person of life, liberty or property without due process of law," nor " deny to any person within its jurisdiction the equal protection of the laws."

We have seen that by the third section of the Tennessee statute corporations organized under the laws of other States or countries, and which complied with the provisions of the statute, were to be deemed and taken to be corporations of that State; and by the fifth section it is declared, in respect of the property of corporations doing business in Tennessee under the provisions of the statute, that creditors who are residents of that State shall have a priority in the distribution of assets, or the subjection of the same, or any part thereof, to the payment of debts, over all simple contract creditors, being residents of any other country or countries.

The suggestion is made that as the statute refers only to " residents," there is no occasion to consider whether it is repugnant to the provision of the National Constitution relating to citizens. We cannot accede to this view. The record shows that the litigation proceeded throughout upon the theory that the plaintiffs in error, Blake and the persons composing the firm of Rogers, Brown & Co., were citizens of Ohio, in which State they resided, transacted business and had their offices, and that the plaintiff in error, the Hull Coal and Coke Company, was a corporation of Virginia. The intervening petition of the individual plaintiffs in error, as we have seen, states that they were residents of Ohio, engaged in business in that State, their residence, offices and places of business being at the city of Cincinnati, and that they were citizens of the United States, and not citizens of Tennessee. Although these allegations might not be sufficient to show that those parties were citizens of Ohio within the meaning of the statute

regulating the jurisdiction of the Circuit Courts of the United States, (*Robertson* v. *Cease*, 97 U. S. 646), they may be accepted as sufficient for that purpose in the present case, no question having been made in the state court that the individual plaintiffs in error were not citizens but only residents of Ohio. Looking at the purpose and scope of the Tennessee statute, it is plain that the words " residents of this State " refer to those whose residence in Tennessee was such as indicated that their permanent home or habitation was there, without any present intention of removing therefrom, and having the intention, when absent from that State, to return thereto; such residence as appertained to or inhered in citizenship. And the words, in the same statute, " residents of any other country or countries " refer to those whose respective habitations were not in Tennessee, but who were citizens, not simply residents, of some other State or country. It is impossible to believe that the statue was intended to apply to creditors of whom it could be said that they were only residents of other States, but not to creditors who were citizens of such States. The State did not intend to place creditors, citizens of other States, upon an equality with creditors, citizens of Tennessee, and to give priority only to Tennessee creditors over creditors who resided in, but were not citizens of, other States. The manifest purpose was to give to all Tennessee creditors priority over all creditors residing out of that State, whether the latter were citizens or only residents of some other State or country. Any other interpretation of the statute would defeat the object for which it was enacted. We must therefore consider whether the statute infringes rights secured to the plaintiffs in error, citizens of Ohio, by the provision of the second section of Article IV of the Constitution of the United States declaring that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States.

Beyond question, a State may through judicial proceedings take possession of the assets of an insolvent foreign corporation within its limits, and distribute such assets or their proceeds among creditors according to their respective rights. But may it exclude citizens of other States from such distri-

bution until the claims of its own citizens shall have been first satisfied? In the administration of the property of an insolvent foreign corporation by the courts of the State in which it is doing business, will the Constitution of the United States permit discrimination against individual creditors of such corporations because of their being citizens of other States, and not citizens of the State in which such administration occurs?

These questions are presented for our determination. Let us see how far they have been answered by the former decisions of this court.

This court has never undertaken to give any exact or comprehensive definition of the words "privileges and immunities" in Article IV of the Constitution of the United States. Referring to this clause, Mr. Justice Curtis, speaking for the court in *Conner* v. *Elliott*, 18 How. 591, 593, said: "We do not deem it needful to attempt to define the meaning of the word *privileges* in this clause of the Constitution. It is safer, and more in accordance with the duty of a judicial tribunal, to leave its meaning to be determined, in each case, upon a view of the particular rights asserted and denied therein. And especially is this true when we are dealing with so broad a provision, involving matters not only of great delicacy and importance, but which are of such a character that any merely abstract definition could scarcely be correct; and a failure to make it so would certainly produce mischief." Nevertheless, what has been said by this and other courts upon the general subject will assist us in determining the particular questions now pressed upon our attention.

One of the leading cases in which the general question has been examined is *Corfield* v. *Coryell*, decided by Mr. Justice Washington at the circuit. He said: "The inquiry is, what are the privileges and immunities of citizens in the several States? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, *fundamental;* which belong, of right, to the citizens of all free governments, and which have, at all times, been enjoyed by the citizens of the several States which compose this Union from the time of their becoming free, independent and sov-

ereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be comprehended under the following general heads: protection by the Government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the Government may justly prescribe for the general good of the whole. The right of a citizen of one State to pass through or to reside in any other State for the purposes of trade, agriculture, professional pursuits or otherwise; to claim the benefit of the writ of *habeas corpus;* to institute and maintain actions of any kind in the courts of the State; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the State, may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental; to which may be added, the elective franchise, as regulated and established by the laws or constitution of the State in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities, and the enjoyment of them by the citizens of each State in every other State was manifestly calculated (to use the expression of the preamble to the corresponding provision in the old Articles of Confederation) 'the better to secure and perpetuate mutual friendship and intercourse among the people of the different States of the Union.'" 4 Wash. C. C. 371, 380.

These observations of Mr. Justice Washington were made in a case involving the validity of a statute of New Jersey regulating the taking of oysters and shells on banks or beds *within* that State, and which excluded inhabitants and residents of other States from the privilege of taking or gathering clams, oysters or shells on any of the rivers, bays or waters *in* New Jersey, not wholly owned by some person residing in the State. The statute was sustained upon the ground that it only regulated the use of the common property

of the citizens of New Jersey, which could not be enjoyed by others without the tacit consent or the express permission of the sovereign having the power to regulate its use. The court said: "The oyster beds belonging to a State may be abundantly sufficient for the use of the citizens of that State, but might be totally exhausted and destroyed if the legislature could not so regulate the use of them as to exclude the citizens of the other States from taking them, except under such limitations and restrictions as the laws may prescribe."

Upon these grounds rests the decision in *McCready* v. *Virginia*, 94 U. S. 391, 395, sustaining a statute of Virginia prohibiting the citizens of other States from planting oysters in a river in that State where the tide ebbed and flowed. Chief Justice Waite, speaking for the court in that case, said: "These [the fisheries of the State] remain under the exclusive control of the State, which has consequently the right, in its discretion, to appropriate its tide waters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation. Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property. The right which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is in fact a property right, and not a mere privilege or immunity of citizenship." Consequently, the decision was that the citizens of one State were not invested by the Constitution of the United States "with any interest in the common property of the citizens of another State."

In *Paul* v. *Virginia*, 8 Wall. 168, 180, the court observed that "it was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same

freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this. *Lemmon* v. *The People*, 20 N. Y. 607. Indeed, without some provision of the kind, removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists."

*Ward* v. *Maryland*, 12 Wall. 418, 430, involved the validity of a statute of Maryland requiring all traders, not being permanent residents of the State, to take out licenses for the sale of goods, wares or merchandise in Maryland, other than agricultural products and articles there manufactured. This court said: "Attempt will not be made to define the words 'privileges and immunities,' or to specify the rights which they are intended to secure and protect, beyond what may be necessary to the decision of the case before the court. Beyond doubt those words are words of very ·comprehensive meaning, but it will be sufficient to say that the clause plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union for the purpose of engaging in lawful commerce, trade or business without molestation; to acquire personal property, to take and hold real estate, to maintain actions in the courts of the State, and to be exempt from any higher taxes or excises than are imposed by the State upon its own citizens. Comprehensive as the power of the States is to lay and collect taxes and excises, it is nevertheless clear, in the judgment of the court, that the power cannot be exercised to any extent in a manner forbidden by the Constitution; and inasmuch as the Constitution provides that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States, it follows that the defendant might lawfully sell, or offer or expose for sale, within the district described in the

indictment, any goods which the permanent residents of the State might sell, or offer or expose for sale in that district, without being subjected to any higher tax or excise than that exacted by law of such permanent residents."

In the *Slaughter-house cases*, 16 Wall. 36, 77, the court, referring to what was said in *Paul* v. *Virginia*, above cited, in reference to the scope and meaning of section 2 of Article IV of the Constitution, said: "The constitutional provision there alluded to did not create those rights which it called privileges and immunities of citizens of the States. It threw around them in that clause no security for the citizen of the State in which they were claimed or exercised. Nor did it profess to control the power of the state governments over the rights of its own citizens. Its sole purpose was to declare to the several States, that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other States within your jurisdiction."

In *Cole* v. *Cunningham*, 133 U. S. 107, 113, 114, this court cited with approval the language of Justice Story, in his Commentaries on the Constitution, to the effect that the object of the constitutional guarantee was to confer on the citizens of the several States "a general citizenship, and to communicate all the privileges and immunities which the citizens of the same State would be entitled to under like circumstances, and this includes the right to institute actions."

These principles have not been modified by any subsequent decision of this court.

The foundation upon which the above cases rest cannot however stand, if it be adjudged to be in the power of one State, when establishing regulations for the conduct of private business of a particular kind, to give its own citizens essential privileges connected with that business which it denies to citizens of other States. By the statute in question the British company was to be deemed and taken to be a corporation of Tennessee, with authority to carry on its business in that State. It was the right of citizens of Tennessee to deal with

it, as it was their right to deal with corporations created by Tennessee. And it was equally the right of citizens of other States to deal with that corporation. The State did not assume to declare, even if it could legally have declared, that that company, being admitted to do business in Tennessee, should transact business only with citizens of Tennessee or should not transact business with citizens of other States. No one would question the right of the individual plaintiffs in error, although not residents of Tennessee, to sell their goods to that corporation upon such terms in respect of payment as might be agreed upon, and to ship them to the corporation at its place of business in that State. But the enjoyment of these rights is materially obstructed by the statute in question; for that statute, by its necessary operation, excludes citizens of other States from transacting business with that corporation upon terms of equality with citizens of Tennessee. By force of the statute alone, citizens of other States, if they contracted at all with the British corporation, must have done so subject to the onerous condition that if the corporation became insolvent its assets in Tennessee should first be applied to meet its obligations to residents of that State, although liability for its debts and engagements was " to be enforced in the manner provided by law for the application of the property of natural persons to the payment of their debts, engagements and contracts." But, clearly, the State could not in that mode secure exclusive privileges to its own citizens in matters of business. If a State should attempt, by statute regulating the distribution of the property of insolvent individuals among their creditors, to give priority to the claims of such individual creditors as were citizens of that State over the claims of individual creditors, citizens of other States, such legislation would be repugnant to the Constitution upon the ground that it withheld from citizens of other States as such, and because they were such, privileges granted to citizens of the State enacting it. Can a different principle apply, as between individual citizens of the several States, when the assets to be distributed are the assets of an insolvent private corporation lawfully engaged in business and having the

power to contract with citizens residing in States other than the one in which it is located?

It is an established rule of equity that when a corporation becomes insolvent it is so far civilly dead that its property may be administered as a trust fund for the benefit of its stockholders and creditors, (*Graham* v. *Railroad Co.*, 102 U. S. 148, 161) — not simply of stockholders and creditors residing in a particular State, but all stockholders and creditors of whatever State they may be citizens. In *Wabash, St. Louis &c. Railway Co.* v. *Ham*, 114 U. S. 587, 594, it was said that the property of a corporation was a trust fund for the payment of its debts, in the sense that when the corporation was lawfully dissolved and all its business wound up, or when it was insolvent, all its creditors were entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders. In *Hollins* v. *Brierfield Coal & Iron Co.*, 150 U. S. 371, 385, it was observed that a private corporation, when it becomes insolvent, holds its assets subject to somewhat the same kind of equitable lien and trust in favor of its creditors that exists in favor of the creditors of a partnership after becoming insolvent, and that in such case a lien and trust will be enforced by a court of equity in favor of creditors. These principles obtain, no doubt, in Tennessee, and will be applied by its courts in all appropriate cases between citizens of that State, without making any distinction *between them.* Yet the courts of that State are forbidden, by the statute in question, to recognize the right in equity of citizens residing in other States to participate upon terms of equality with citizens of Tennessee in the distribution of the assets of an insolvent foreign corporation lawfully doing business in that State.

We hold such discrimination against citizens of other States to be repugnant to the second section of the Fourth Article of the Constitution of the United States, although, generally speaking, the State has the power to prescribe the conditions upon which foreign corporations may enter its territory for purposes of business. Such a power cannot be exerted with the effect of defeating or impairing rights secured to citizens

of the several States by the supreme law of the land.    Indeed, all the powers possessed by a State must. be exercised consistently with the privileges and immunities granted or protected by the Constitution of the United States.

In *Lafayette Ins. Co.* v. *French*, 18 How. 400, 407, Mr. Justice Curtis, speaking for this court, said: "A corporation created by Indiana can transact business in Ohio only with the consent, expressed or implied, of the latter State.    This consent may be accompanied by such conditions as Ohio may think fit to impose; and these conditions must be deemed valid and effectual by other States and by this court, provided they are not. repugnant to the Constitution and laws of the United States, or inconsistent with those rules of public law which secure the jurisdiction and authority of each State from encroachment by all others, or that principle of natural justice which forbids condemnation without opportunity for defence."    It was accordingly adjudged in *Barron* v. *Burnside*, 121 U. S. 186, 200, that an Iowa statute requiring every foreign corporation named in it, as a condition of obtaining a license or permit to transact business in that State, to stipulate that it would not remove into the Federal courts suits that were removable from the state courts under the laws of the United States, was void because it made the right to do business under a license or permit dependent upon the surrender by the corporation of a privilege secured to it by the Constitution.    This principle was recognized in *Barrow Steamship Co.* v. *Kane*, 170 U. S. 100, 111, in which, after referring to the constitutional and statutory provisions defining the jurisdiction of the Circuit Courts of the United States, this court said: "The jurisdiction so conferred upon the national courts cannot be abridged or impaired by any statute of a State. *Hyde* v. *Stone*, 20 How. 170, 175; *Smyth* v. *Ames*, 169 U. S. 466, 516.    It has therefore been decided that a statute, which requires all actions against a county to be brought in a county court, does not prevent the Circuit Court of the United States from taking jurisdiction of such an action; Chief Justice Chase saying that 'no statute limitation of suability can defeat .a jurisdiction given by the Constitution.'    *Cowles* v. *Mercer*

*County,* 7 Wall. 118, 122; *Lincoln County* v. *Luning,* 133 U. S. 529; *Chicot County* v. *Sherwood,* 148 U. S. 529. So statutes requiring foreign corporations, as a condition of being permitted to do business within the State, to stipulate not to remove into the courts of the United States suits brought against them in the courts of the State, have been adjudged to be unconstitutional and void. *Home Ins. Co.* v. *Morse,* 20 Wall. 445; *Barron* v. *Burnside,* 121 U. S. 186; *Southern Pacific Co.* v. *Denton,* 146 U. S. 202." See *Ducat* v. *Chicago,* 10 Wall. 410, 415.

We must not be understood as saying that a citizen of one State is entitled to enjoy in another State *every* privilege that may be given in the latter to its own citizens. There are privileges that may be accorded by a State to its own people in which citizens of other States may not participate except in conformity to such reasonable regulations as may be established by the State. For instance, a State cannot forbid citizens of other States from suing in its courts, that right being enjoyed by its own people; but it may require a non-resident, although a citizen of another State, to give bond for costs, although such bond be not required of a resident. Such a regulation of the internal affairs of a State cannot reasonably be characterized as hostile to the fundamental rights of citizens of other States. So, a State may, by rule uniform in its operation as to citizens of the several States, require residence within its limits for a given time before a citizen of another State who becomes a resident thereof shall exercise the right of suffrage or become eligible to office. It has never been supposed that regulations of that character materially interfered with the enjoyment by citizens of each State of the privileges and immunities secured by the Constitution to citizens of the several States. The Constitution forbids only such legislation affecting citizens of the respective States as will substantially or practically put a citizen of one State in a condition of alienage when he is within or when he removes to another State, or when asserting in another State the rights that commonly appertain to those who are part of the political community known as the People of the United States, by and

for whom the Government of the Union was ordained and established.

. Nor must we be understood as saying that a State may not, by its courts, retain within its limits the assets of a foreign corporation, in order that justice may be done to its own citizens; nor, by appropriate action of its judicial tribunals, see to it that its own citizens are not unjustly discriminated against by reason of the administration in other States of the assets there of an insolvent corporation doing business within its limits. For instance, if the Embreeville Company had property in Virginia at the time of its insolvency, the Tennessee court administering its assets in that State could take into account what a Virginia creditor, seeking to participate in the distribution of the company's assets in Tennessee, had received or would receive from the company's assets in Virginia, and make such order touching the assets of the company in Tennessee as would protect Tennessee creditors against wrongful discrimination. arising from the particular action taken in Virginia for the benefit of creditors residing in that Commonwealth.

It may be appropriate to observe that the objections to the statute of Tennessee do not necessarily embrace enactments that are found in some of the States requiring foreign insurance corporations, as a condition of their coming into the State for purposes of business, to deposit with the state treasurer funds sufficient to secure policy holders in its midst. Legislation of that character does not present any question of discrimination against citizens forbidden by the Constitution. Insurance funds set apart in advance for the benefit of home policy holders of a foreign insurance company doing business in the State are a trust fund of a specific kind to be administered for the exclusive benefit of certain persons. Policy holders in other States know that those particular funds are segregated from the mass of property owned by the company, and that they cannot look to them to the prejudice of those for whose special benefit they were deposited. The present case is not one. of that kind. The statute of Tennessee did not make it a condition of the right of the British corporation

to come into Tennessee for purposes of business that it should, at the outset, deposit with the State a fixed amount to stand exclusively or primarily for the protection of its Tennessee creditors. It allowed that corporation, after complying with the terms of the statute, to conduct its business in Tennessee as it saw fit, and did not attempt to impose any restriction upon its making contracts with or incurring liabilities to citizens of other States. It permitted that corporation to contract with citizens of other States, and then, in effect, provided that all such contracts should be subject to the condition (in case the corporation became insolvent) that creditors residing in other States should stand aside, in the distribution by the Tennessee courts of the assets of the corporation, until creditors residing in Tennessee were fully paid — not out of any funds or property specifically set aside as a trust fund, and at the outset put into the custody of the State, for the exclusive benefit, or for the benefit primarily, of Tennessee creditors, but — out of whatever assets of any kind the corporation might have in that State when insolvency occurred. In other words, so far as Tennessee legislation is concerned, while this corporation could lawfully have contracted with citizens of other States, those citizens cannot share in its general assets upon terms of equality with citizens of that State. If such legislation does not deny to citizens of other States, in respect of matters growing out of the ordinary transactions of business, privileges that are accorded to it by citizens of Tennessee, it is difficult to perceive what legislation would effect that result.

We adjudge that when the general property and assets of a private corporation, lawfully doing business in a State, are in course of administration by the courts of such State, creditors who are citizens of other States are entitled, under the Constitution of the United States, to stand upon the same plane with creditors of like class who are citizens of such State, and cannot be denied equality of right simply because they do not reside in that State, but are citizens residing in other States of the Union. The individual plaintiffs in error were entitled to contract with this British corporation, lawfully doing business in Tennessee, and deemed and taken to be a corporation

of that State; and no rule in the distribution of its assets among creditors could be applied to them as resident citizens of Ohio, and because they were not residents of Tennessee, that was not applied by the courts of Tennessee to creditors of like character who were citizens of Tennessee.

As to the plaintiff in error, the Hull Coal & Coke Company of Virginia, different considerations must govern our decision. It has long been settled that, for purposes of suit by or against it in the courts of the United States, the members of a corporation are to be conclusively presumed to be citizens of the State creating such corporation; *Louisville, Cincinnati & Charleston Railroad Co.* v. *Letson*, 2 How. 497; *Covington Drawbridge Co.* v. *Shepherd &c.*, 20 How. 227, 232; *Ohio & Miss. Railroad Co.* v. *Wheeler*, 1 Black, 286, 296; *Steamship Co.* v. *Tugman*, 106 U. S. 118, 120; *Barrow Steamship Co.* v. *Kane*, 170 U. S. 100; and therefore it has been said that a corporation is to be deemed, for such purposes, a citizen of the State under whose laws it was organized. But it is equally well settled, and we now hold, that a corporation is not a citizen within the meaning of the constitutional provision that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." *Paul* v. *Virginia*, 8 Wall. 168, 178, 179; *Ducat* v. *Chicago*, 10 Wall. 410, 415; *Liverpool Ins. Co.* v. *Massachusetts*, 10 Wall. 566, 573. The Virginia corporation, therefore, cannot invoke that provision for protection against the decree of the state court denying its right to participate upon terms of equality with Tennessee creditors in the distribution of the assets of the British corporation in the hands of the Tennessee court.

Since, however, a corporation is a "person" within the meaning of the Fourteenth Amendment, (*Santa Clara County* v. *Southern Pacific Railroad Co.*, 118 U. S. 394, 396; *Smyth* v. *Ames*, 169 U. S. 466, 522,) may not the Virginia corporation invoke for its protection the clause of the Amendment declaring that no State shall deprive any person of property without due process, nor deny to any person within its jurisdiction the equal protection of the laws?

We are of opinion that this question must receive a negative

answer. Although this court has adjudged that the prohibitions of the Fourteenth Amendment refer to all the instrumentalities of the State, to its legislative, executive and judicial authorities, (*Ex parte Virginia*, 100 U. S. 339, 346–347; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373; *Scott* v. *McNeal*, 154 U. S. 34, 45, and *Chicago, Burlington &c. Railroad* v. *Chicago*, 166 U. S. 226, 233,) it does not follow that, within the meaning of that Amendment, the judgment below deprived the Virginia corporation of property without due process of law, simply because its claim was subordinated to the claims of the Tennessee creditors. That corporation was not, in any legal sense, deprived of its claim, nor was its right to reach the assets of the British corporation in other States or countries disputed. It was only denied the right to participate upon terms of equality with Tennessee creditors in the distribution of particular assets of another corporation doing business in that State. It had notice of the proceedings in the state court, became a party to those proceedings, and the rights asserted by it were adjudicated. If the Virginia corporation cannot invoke the protection of the second section of Article IV of the Constitution of the United States relating to the privileges and immunities of citizens in the several States, as its co-plaintiffs in error have done, it is because it is not a citizen within the meaning of that section; and if the state court erred in its decree in reference to that corporation, the latter cannot be said to have been thereby *deprived* of its property without due process of law within the meaning of the Constitution.

It is equally clear that the Virginia corporation cannot rely upon the clause declaring that no State shall "deny to any person within its jurisdiction the equal protection of the laws." That prohibition manifestly relates only to the denial by the State of equal protection to persons "within its jurisdiction." Observe, that the prohibition against the deprivation of property without due process of law is not qualified by the words "within its jurisdiction," while those words are found in the succeeding clause relating to the equal protection of the laws. The court cannot assume that those words were inserted

without any object, nor is it at liberty to eliminate them from the Constitution and to interpret the clause in question as if they were not to be found in that instrument. Without attempting to state what is the full import of the words, "within its jurisdiction," it is safe to say that a corporation not created by Tennessee, nor doing business there under conditions that subjected it to process issuing from the courts of Tennessee at the instance of suitors, is not, under the above clause of the Fourteenth Amendment, within the jurisdiction of that State. Certainly, when the statute in question was enacted the Virginia corporation was not within the jurisdiction of Tennessee. So far as the record discloses, its claim against the Embreeville Company was on account of coke sold and shipped from Virginia to the latter corporation at its place of business in Tennessee. It does not appear to have been doing business in Tennessee under the statute here involved, or under any statute that would bring it directly under the jurisdiction of the courts of Tennessee by service of process on its officers or agents. Nor do we think it came within the jurisdiction of Tennessee, within the meaning of the Amendment, simply by presenting its claim in the state court and thereby becoming a party to this cause. Under any other interpretation the Fourteenth Amendment would be given a scope not contemplated by its framers or by the People, nor justified by its language. We adjudge that the statute, so far as it subordinates the claims of private business corporations not within the jurisdiction of the State of Tennessee, (although such private corporations may be creditors of a corporation doing business in the State under the authority of that statute,) to the claims against the latter corporation of creditors residing in Tennessee, is not a denial of the "equal protection of the laws" secured by the Fourteenth Amendment to persons within the jurisdiction of the State, however unjust such a regulation may be deemed.

What may be the effect of the judgment of this court in the present case upon the rights of creditors not residing in the United States, it is not necessary to decide. Those creditors are not before the court on this writ of error.

*The final judgment of the Supreme Court of Tennessee must be affirmed as to the Hull Coal & Coke Company, because it did not deny to that corporation any right, privilege or immunity secured to it by the Constitution of the United States. (Rev. Stat. § 709.) As to the other plaintiffs in error, citizens of Ohio, the judgment must be reversed, and the cause remanded for further proceedings not inconsistent with this opinion; and it is so ordered.*

Mr. Justice Brewer, with whom Mr. Chief Justice Fuller concurred, dissenting.

I am unable to concur in the opinion of the court in this case. In my judgment it misconceives the language of the statute, the issues presented by the pleadings, and the decision of the state court. The act does not discriminate between citizens of Tennessee and those of other States. Its language is creditors "residents of this State shall have a priority . . . over all simple contract creditors being residents of any other country or countries." The allegation of the amended bill is, "your orators are all residents of the State of Tennessee and were such at the time the various debts sued on in this cause were created," and that by virtue of the statute they are entitled to priority over the "defendant, Rogers, Brown & Co., and all other creditors of said insolvent corporation who do not reside in the State of Tennessee, or did not so reside at the time their credits were given." The intervening petition of the plaintiffs in error, Blake and Rogers, Brown & Co., alleges "that they are residents of the State of Ohio, and were at the times and dates hereinafter named engaged in business in said State, their residences, offices and places of business being at the city of Cincinnati." The decree of the Chancery Court of Appeals adjudges "that all of the creditors of said company who resided in the State of Tennessee are entitled to priority of payment out of all of the assets of the company of every kind over all of the creditors of said company who do not reside in the State of Tennessee." And the decree of the Supreme Court of the State is in substantially the

same language, adjudging "that all of the creditors of the
Embreeville Freehold Land, Iron and Railway Company,
Limited, who reside in the State of Tennessee, are entitled
to priority of payment out of all of the assets of said com-
pany, both real and personal, over all of the other creditors of
said company who do not reside in the State of Tennessee,
whether they be residents of other States of the United States
or of the Kingdom of Great Britain." So that neither the
statute, the pleadings nor the decree raise any question of
citizenship, or give any priority of right to the citizens of Ten-
nessee over citizens of other States, but only discriminate
between residents, and give residents of the State a priority.
I think it improper to go outside of a case to find a question
which is not in the record simply because it may be discussed
by counsel for one party, who apparently decline to recognize
any difference between residence and citizenship. For all this
record discloses, the plaintiffs in error other than the cor-
poration may have been citizens of the State of Tennessee,
temporarily residing and doing business in Ohio, and the con-
troversy one simply between citizens of the same State. It is
not necessary in this court to refer to the difference between
residence and citizenship. Neither is synonymous with the
other, and neither includes the other. A British subject or a
citizen of Ohio may be a resident of Tennessee, and entitled to
the benefit of this statute. A citizen of Tennessee may, like
these plaintiffs in error, be a resident of and doing business in
Ohio and not entitled to its benefit. It will be time enough
to consider the question discussed in the opinion when it ap-
pears that a State has attempted to discriminate between its
own citizens and citizens of other States, and the courts of the
State have affirmed the validity of such discrimination.

Taking the statute as it reads, and assuming that the legis-
lature of Tennessee meant that which it said, the question is
whether a State, permitting a foreign corporation which is not
engaged in interstate commerce to come into its territory and
there do business, has the power to protect all persons resid-
ing within its limits who may have dealings with such foreign
corporation by requiring it to give them a prior security on its

assets within the State. The principle underlying this statute is that a State, which can have no jurisdiction beyond its territorial limits, has the power in reference to foreign corporations permitted to do business therein to protect all persons within those limits, whether citizens or not, in respect to claims upon the property thereof also within those limits. That a State may keep such a corporation out of its territory is conceded; and that, in permitting it to enter, the State may impose such conditions as it sees fit, is, as a general proposition, also admitted. In *Crutcher* v. *Kentucky*, 141 U. S. 47, 59, it was said:

"The insurance business, for example, cannot be carried on in a State by a foreign corporation without complying with all the conditions imposed by the legislation of that State. So with regard to manufacturing corporations, and all other corporations whose business is of a local and domestic nature, which would include express companies whose business is confined to points and places wholly within the State. The cases to this effect are numerous. *Bank of Augusta* v. *Earle*, 13 Pet. 519; *Paul* v. *Virginia*, 8 Wall. 168; *Liverpool Insurance Company* v. *Massachusetts*, 10 Wall. 566; *Cooper Manufacturing Company* v. *Ferguson*, 113 U. S. 727; *Phila. Fire Association* v. *New York*, 119 U. S. 110."

Every one dealing with a foreign corporation is bound to take notice of the statutes of the State imposing conditions upon that corporation in respect to the transaction of its business within the State, just as he must take notice of any mortgage or other incumbrance placed by the corporation upon its property there situated. A State may and often does provide that persons furnishing supplies to and doing work for a corporation shall have a lien upon the property of that corporation prior to any mortgage. The validity of such legislation has always been sustained, and they who loan their money to the corporation do so with notice of the limitation, and have no constitutional right of complaint if their mortgage is thereafter postponed to simple contract obligations. If voluntarily the corporation placed a mortgage upon all its assets within the State to secure a debt to a single creditor residing within

the State, and such mortgage was duly recorded, no one would have the hardihood to say that a resident or citizen of another State could challenge its validity or its priority over his unsecured debt simply because he was a citizen of another State, or did not, in fact, know of its existence. And that which is true in case of a mortgage to a single creditor would be equally true in case such foreign corporation placed a mortgage upon its assets to secure every creditor within the State. The number of creditors secured does not change the validity of the security or affect the matter of notice or relieve the foreign creditor from the consequences of notice. If the corporation may voluntarily place a mortgage upon all its assets within the State to secure its creditors within the State, why may not the legislature require as a condition of its doing business that it give such a mortgage? Is the corporation more powerful than the State? Is a voluntarily executed mortgage more valid than a statute? If, in fact, in pursuance of such a statute a mortgage to each separate creditor was given and recorded as fast as the corporation came under obligation to him, could a non-resident creditor question the validity of the mortgage or the priority given thereby? And is the effect of the statute in controversy anything other than the imposition upon the assets of the corporation within the State of a single mortgage in favor of home creditors? If written out and recorded, who could question its validity or its priority? The statute in its spirit and effect does nothing more. That it is prospective in its operation is immaterial — statutes generally are. The validity of an after-acquired property clause in a mortgage has become settled; none the less valid is it in a statute.

It is conceded, in the opinion of the court, that a foreign insurance corporation might be required to make a special deposit with the state treasurer to secure local policy holders, but if it is within the constitutional power of the State to require such special deposit, and when made it becomes in fact a security to the home policy holders, I am unable to appreciate why the State may not require a general mortgage on all the assets within the State as like security. Looking at it

simply as a question of power on the part of the State, what difference can there be between a pledge of a special fund and a mortgage of the entire fund within the State? And that which is true in respect to an insurance corporation must also be true of any other corporation not engaged in interstate commerce business.

Indeed, aside from the demand made by the statutes of certain States of deposits by foreign corporations to secure home creditors, there are frequent illustrations of discrimination based upon the matter of residence. Often non-resident plaintiffs are required to give security for costs when none is demanded of resident suitors. Attachments will lie in the beginning of an action, authorizing the seizure of property upon the ground that the defendant is a non-resident, when no such seizure is permitted in case of resident defendants. These and many similar illustrations, which might be suggested, only disclose that it has been accepted as a general truth that a State may discriminate on the ground of residence, and that such discrimination is not to be condemned as one between citizens ; and yet if the doctrine of the opinion of the court in this case be correct, I cannot see how those statutes can be sustained, for surely they discriminate between non-resident and resident suitors in the matter of fundamental rights, to wit, the right of equal entrance into the courts and equal security in the possession of property.

It may not be uninteresting to notice the case of *Fritts* v. *Palmer*, 132 U. S. 282. That case came from Colorado. The statutes of that State, as quoted in the opinion of the court, provided, among other things —

" SEC. 260. Foreign corporations shall, before they are authorized or permitted to do any business in this State, make and file a certificate signed by the president and secretary of such corporation, duly acknowledged, with the secretary of State, . . . and no corporation doing business in the State, incorporated under the laws of any other State, shall be permitted to mortgage, pledge or otherwise incumber its real or personal property situated in this State, to the injury or exclusion of any citizen, citizens or corporations of this State

who are creditors of such foreign corporation, and no mortgage by any foreign corporation, except railroad and telegraph companies, given to secure any debt created in any other State, shall take effect as against any citizen or corporation of this State until all its liabilities due to any person or corporation in this State at the time of recording such mortgage have been paid and extinguished."

Commenting upon this section, and others, this court said (p. 288):

"No question is made in this case — indeed, there can be no doubt — as to the validity of these constitutional and statutory provisions, so far, at least, as they do not directly affect foreign or interstate commerce. In *Cooper Manufacturing Co.* v. *Ferguson*, 113 U. S. 727, 732, this court said that ' the right of the people of a State to prescribe generally by its constitution and laws the terms upon which a foreign corporation shall be allowed to carry on its business in the State, has been settled by this court.' "

It will be perceived that the statute of Colorado restrained a foreign corporation from mortgaging, pledging or otherwise incumbering its property situate in the State to the injury or exclusion of any citizen of the State, creditor of such corporation, and further provided that no mortgage given by such foreign corporation to secure a debt created in another State should take effect against any citizen of the State until all liabilities due to any person or corporation in the State had been paid and extinguished. But this court said, and I think correctly, that there could be no doubt of the validity of these statutory provisions. It may be said, and said truthfully, that the attention of the court was not specially directed to this particular portion of the statute, and hence that the decision cannot be taken as authority. Yet the section was spread before the court, it is quoted in its opinion, and it was so obviously constitutional that neither counsel nor court had any doubt thereof. I note this case in order to suggest the objectionable evolution of the thought that a State may not protect those persons who are within its jurisdiction in respect to property also within its jurisdiction, or impose conditions on

foreign corporations doing business therein, which amount to such protection. Ten years ago a statute of Colorado guaranteeing priority to citizens of the State over all other creditors, even those by mortgage, was by all parties, counsel and by court, conceded to be free from objection, while to-day a statute of Tennessee, in no way discriminating between citizens, but only between residents and in respect to foreign corporations, is declared to be so plainly at variance with the Constitution of the United States that it must be adjudged void.

The doctrine of this opinion is that a State has no power to secure protection to persons within its jurisdiction, citizens or non-citizens, in respect to property also within its jurisdiction, because, forsooth, such protection may in some cases work to the disadvantage of one who is not only a non-resident but also not a citizen of the State. It seems to me that the practical working out of this doctrine will be not that the State may not discriminate in favor of its own residents as against non-residents, but that the State must discriminate in favor of non-residents and against its own residents. Take this illustration: A corporation organized and having its home office in New York comes into California to do business. The State of California attempts to require that its assets within the State shall be kept as a primary security for home creditors. This court declares that such requisition is unconstitutional. The solvency or insolvency of that New York corporation will be known in New York by those who are nearer to its home office sooner than by people in California. Insolvency is impending. The creditors in New York, near the home office, and familiar therefore with its exact condition, ascertaining its approaching insolvency, send to California, where there are assets, and, availing themselves of the ordinary statutory provisions of that State, seize by attachment all the assets there situated. The insolvency is thereafter made public, and the California creditors find that all the assets of the corporation within their State have been seized by creditors outside the State, and they are driven to the State of New York, where the corporation was organized, where its home

office and home assets are, to see what share in the unappropriated assets they can obtain, while the New York creditors, by reason of their early information, secure full payment. Practically, the effect is to compel the State to discriminate in favor of the New York against the home creditors. The suggestion that after the New York creditors have perfected their liens upon the assets in California, the courts of that State will stay proceedings until they see that the New York courts have given full protection to the California creditors in the assets in New York, is visionary and impracticable. There may be assets in twenty States, and there is no control by the courts of one State over proceedings in the courts of other States. Of course, if the California courts can wait till the New York courts have acted, the converse is also true, and so a game of seesaw may be established between the courts of the two States. For these, among other reasons, I am constrained to dissent from this opinion and judgment.

I am authorized to state that the Chief Justice concurs in this dissent.