OPINION OF THE COURT
Harold Baer, Jr., J.
This is an application by Bankorp Ltd. (Bankorp) for an *123 order directing the Superintendent of Banks of the State of New York (Superintendent) to turn over to Bankorp some $1.6 million being held by the Superintendent as part of segregated funds in this liquidation. This decision addresses the important issue of the constitutionality of the liquidation procedures of Banking Law § 606.
BACKGROUND
On July 5, 1991, the Superintendent, together with leading banking authorities in other countries, seized the empire of the Bank of Credit and Commerce International, S.A. (BCCI S.A.) and related entities. On that day, pursuant to Banking Law § 606 (4), the Superintendent seized the New York Agency of BCCI S.A. and property of BCCI S.A. in New York separate from the Agency, including bank accounts of BCCI S.A. in nine New York banks. BCCI S.A. is a foreign bank. An agency of a foreign bank is a local office (though not a separately incorporated entity) authorized to conduct a restricted banking business in New York State. One of the nine institutions holding deposits of BCCI S.A., Security Pacific International Bank (Security), was a participant in an abortive effort to effectuate a currency swap between BCCI S.A. London and Bankorp, an international bank with offices in London. Bankorp paid its end of the swap to BCCI S.A. in London but never received what it was owed by BCCI S.A. Bankorp seeks to obtain the unpaid $1.6 million from the Superintendent on the ground that the transaction mistakenly failed to close on July 5. In a separate decision, I have rejected all but one of Bankorp’s arguments. What is before me now for determination is the contention that the liquidation scheme of the Banking Law is unconstitutional.
Section 606 (4) (a) provides that after the Superintendent has seized the business and property of a foreign bank, the claims of creditors of the foreign corporation "arising out of transactions had by them with its New York agency or agencies, or with its New York branch or branches, shall be preferred against such business and property in this state.” When the claims of these preferred creditors and the expenses of the liquidation have been paid, the Superintendent is required, upon order of the Supreme Court, to turn the remaining assets over to the principal office of the foreign bank or to the liquidator or receiver thereof. (Banking Law § 606 [4] [b].) Bankorp argues that it is unconstitutional for *124 the Superintendent "to favor creditors with [sic] the New York Agency by insuring that they have as their pool of assets all of BCCI S.A.’s funds found in New York.”
DISCUSSION
It is not a novel notion that economic regulations enacted by legislatures are subject to great deference. The Constitution, as we all now know, did not enact as the fundamental law of the Republic Mr. Herbert Spencer’s Social Statics, or any other particular economic doctrine. Therefore, when a litigant hauls out the Equal Protection Clause as his or her primary weapon against some form of economic regulation, the litigant must do much more than show that the regulation is doubtful or even controversial. (See, e.g., Cleburne v Cleburne Living Ctr., 473 US 432, 440 [1985]; Northeast Bancorp v Board of Governors, Fed. Reserve Sys., 472 US 159, 176-178 [1985]; New Orleans v Dukes, 427 US 297, 303 [1976].) Banking Law § 606 will be invalidated only if it can be shown that the statute is not rationally related to a legitimate State interest.
Bankorp suggests that section 606 impermissibly distinguishes between out-of-State creditors such as itself and residents of New York, giving to the latter preferred access to the impounded assets of the foreign bank. Likewise it is improper, Bankorp urges, for the Superintendent to apply the assets of BCCI S.A. London to claims of the creditors of the New York Agency before resolving claims against BCCI S.A. London that arose here.
It is true that in a proceeding to distribute the assets of a foreign corporation a State may not exclude the claims of citizens of other States until those of its own citizens are resolved. The Supreme Court held as much almost 100 years ago. (Blake v McClung, 172 US 239 [1898]; see also, People v Granite State Provident Assn., 161 NY 492 [1900].) The weakness of Bankorp’s argument is that this principle is simply not implicated by the Superintendent’s adherence to section 606.
Section 606 does not, directly or indirectly, give preference to New York creditors over those resident elsewhere. The distinction drawn by the statute has nothing to do with residence in or citizenship of New York, but rather is between creditors whose claims arise out of business done with the foreign bank’s New York Agency, whether they reside in New York or not, and those whose claims arise out of dealings with the bank or its branches elsewhere. Persons who conduct *125 transactions with the New York Agency of a foreign bank are not restricted to those who pay resident income taxes to the State of New York. Bankorp is thus tilting at a windmill that does not exist.
Although the statutory scheme is not fatally flawed for the reason primarily urged by Bankorp, is it deficient in another way? Bankorp also argues that the statute unlawfully discriminates among creditors by creating a preferred group of creditors, the creditors of the New York Agency, and a disfavored group, creditors of BCCI S.A. in general. This argument is not convincing.
The statutory scheme, in my judgment, is clearly not arbitrary or irrational. (Hale House Ctr. v Federal Deposit Ins. Corp., 788 F Supp 1309 [SD NY 1992].) Quite the contrary. New York is the banking capital of the world. It is by far the principal center for foreign banking in the United States. At last count, banks from 64 foreign countries are present in New York. While 49 of the 50 largest banks in the world have their headquarters outside this country, all have offices in New York. This State licenses and supervises agencies and branches of over 200 foreign banks with over $400 billion of assets in New York (Report of Superintendent’s Advisory Comm on Transnational Banking Insts, at 2-3 [Mar. 1992]) (Advisory Report). This is a gargantuan business. In the years ahead, as national economies become yet more intertwined, international banking will expand even further.
For New York City and New York State, it is important, perhaps vital, that foreign banking prosper and flourish here. New York thus reasonably desires to attract foreign banks and to persuade them to stay. At the same time, since the banks are headquartered outside this country, New York has a strong interest in insuring that those who deal with foreign banks in this State, whatever their citizenship, are protected. These are legitimate aims for a State in our union.
To attract foreign banks, New York permits the licensing and operation of agencies and branches here. Foreign banks are not required to go through all the complexities and incur all the expense of creating domestic subsidiaries in order to do business here. This is advantageous to the banks. (Advisory Report, op. cit., at 8-9.) At the same time, the State acts to protect those who do business with the agencies and branches of foreign banks by means of the liquidation scheme here under attack. Section 606 serves to provide the greatest possi *126 ble protection to creditors of each New York Agency, while also avoiding competition among creditors to seize the assets of the foreign bank in New York. Any surplus assets are returned to the foreign bank or its liquidator or receiver for distribution among creditors of the bank’s other branches and agencies. This is a rational and balanced system for the regulation of foreign banking.
The liquidation system is of course no secret. Foreign banks know before setting up agencies and branches here what the law is and what it requires in the event of liquidation. A foreign bank is free to open accounts here at other banks without establishing a business presence in the form of an agency or branch. But if it wishes to have an agency or branch here, it must adhere to New York law, including the liquidation scheme. The New York system has a direct impact on the credit risks undertaken by customers who transact business in New York with foreign agencies or branches. The customers know and calculate those risks in deciding how to act. Customers who enter into transactions with agencies or branches of a foreign bank outside New York do not look to rely upon assets maintained in New York or New York law. (See, Matter of Siebert, 135 Misc 2d 1093 [Sup Ct 1987].)
If the current system were overturned, the New York Legislature and New York regulators would have to find some other means to accommodate the promotion of the foreign banking business and the protection of customers of foreign banks in New York. Extensive regulation far beyond that which exists now might be required, or, more likely, foreign banks would be obliged to set up subsidiaries in New York and capitalize them according to stringent standards. It is not in the interests of New York to impose such regulations if there is another way to achieve its objectives that is reasonable and fair. Indeed, it is not in the interests of the United States because the requirement that business be done by subsidiary only could cause the disappearance of a significant part of foreign banking business and the drying up of part of the pool of capital in United States markets. (Advisory Report, op. cit., at 9, 11.) That other way exists now.
Furthermore, it is not clear that if this court were to hold that only assets of the New York Agency could be subjected to the liquidation process, liquidators in other countries in this case or in other cases would follow suit. If they did not, and if worldwide assets are insufficient to pay all creditors worldwide, those who dealt with the New York Agency of BCCI S.A. *127 in this instance or other agencies in other instances would be at a disadvantage. Perhaps an international treaty is needed to govern the liquidation of international banks. Until that treaty is signed, however, the New York scheme is reasonable and passes equal protection scrutiny. (Advisory Report, op. cit., at 73-78.)
Bankorp did not do business with the New York Agency and is not a creditor of it. It is a creditor of the BCCI S.A. London Agency. Bankorp suggests that its claim to funds of BCCI S.A.’s London Agency once on deposit with Security arose in New York. Not so. The transaction was arranged between Bankorp and BCCI S.A. London in London and Bankorp paid sterling to BCCI S.A. in London. All that remained was for dollars to be transferred to an account of Bankorp, which could have occurred in any number of places. In its argument on the other issues in the case, Bankorp emphasizes that this transfer was purely a ministerial act. No employees of the New York Agency were involved in the attempted transfer here. That the exchange was to take place by way of a transfer from Security’s BCCI S.A. account to an account of Bankorp with another bank in New York does not mean that the claim arose in New York. Certainly BCCI S.A. London had nothing to do with Bankorp’s failure to get paid in New York, which occurred because Security did not make the transfer prior to the takeover and shutdown of the BCCI empire.
The application is denied.