## In re BOGGS–RICE CO., Inc.

### ATHENS STOVE WORKS et al. v. FLEMING et al.

District Court, W. D. Virginia, at Abingdon.
Jan. 27, 1933.

Benj. S. Gore, of Bristol, Tenn., for Tennessee corporation creditors.

H. H. Haynes, Sr., of Bristol, Tenn., and W. H. Robertson, of Bristol, Va., for Boggs.

J. P. Buchanan, of Marion, Va., and H. E. Widener, of Bristol, Va., for the Lincolns.

Donald T. Stant and S. Bruce Jones, both of Bristol, Va., for trustees of bankrupt estate.

McDOWELL, District Judge.

On May 31, 1932, a voluntary petition for bankruptcy was filed in this court at Abingdon by the Boggs-Rice Company, Inc., a retail dealer in furniture. On June 1st the order of adjudication and reference was signed, and entered on June 8th.

The bankrupt was operating a store in Bristol, Tenn.; one at Glade Springs, Washington county, Va.; one at Marion, Smyth county, Va.; one at Wytheville, Wythe county, Va.; and one at Appalachia, Wise county, Va.

### I. Priority Claims of Tennessee Corporations.

By his order of November 17, 1932, the referee disallowed the claims to priority of payment of the following petitioners for review, all of whom are said to be corporations created by the laws of Tennessee: King Printing Company, Empire Chair Company, Inter-State Hardware & Supply Company, Drugan Motor Company, Athens Table & Manufacturing Company, Art Wood Carving Company, Athens Stove Works.

In the case at bar the bankrupt, a Virginia corporation, had qualified itself to do business in Tennessee, and had in that state a stock of furniture and other assets. Among the many creditors of the bankrupt are: (1) Sundry corporations created by the laws of Tennessee; (2) sundry individuals, residents of Tennessee, and many individuals of states other than Tennessee; and (3) sundry corporations created by states other than Tennessee. The Tennessee corporation creditors of the bankrupt claim, under section 2552, Shannon's Code, in respect to the proceeds derived from the bankrupt's assets which were located in Tennessee, a right of priority over both the nonresident individual creditors and the nonresident corporation creditors.

Section 2552 of Shannon's Code is identical with section 5 of the Tennessee Act of March 19, 1877, c. 31, and is quoted in full in Blake v. McClung, 172 U. S. 239,

241, 242, 19 S. Ct. 165, 43 L. Ed. 432. So far as is presently of interest, this statute reads as follows:

"Sec. 5. That the corporations and the property of all corporations coming under the provisions of this act, shall be liable for all the debts, liabilities and engagements of the said corporations, to be enforced in the manner provided by law, for the application of the property of natural persons to the payment of their debts, engagements and contracts. Nevertheless, creditors who may be residents of this State shall have a priority in the distribution of assets, or subjection of the same, or any part thereof, to the payment of debts over all simple contract creditors, being residents of any other country or countries. * * * "

In Blake v. McClung, it was held that the foregoing statute is unconstitutional in respect to nonresident individual creditors of a foreign corporation which had been authorized to carry on business in Tennessee; but valid in respect to corporation creditors nonresidents of Tennessee. See Blake v. McClung, 172 U. S. 239, 19 S. Ct. 165, 43 L. Ed. 432; Id., 176 U. S. 59, 20 S. Ct. 307, 44 L. Ed. 371; Sully v. American National Bank, 178 U. S. 289, 20 S. Ct. 935, 44 L. Ed. 1072; In re Standard Oak Veneer Co. (D. C.) 173 F. 103. None of these Supreme Court cases cited related to bankruptcy. The Standard Oak Veneer Case (Judge Sanford) was a bankruptcy case, but it antedated the Bankrupt Act of 1926.

The question here presented is the effect of the proviso to section 64b(7) of the Bankrupt Act, enacted in 1926, on the ruling of the Supreme Court in Blake v. McClung, supra, 172 U. S. 239, 19 S. Ct. 165, 43 L. Ed. 432; Id., 176 U. S. 59, 20 S. Ct. 307, 44 L. Ed. 371, and Judge Sanford's ruling in the Standard Oak Veneer Case (D. C.) 173 F. 103, in respect to nonresident corporation creditors of a bankrupt corporation which had been authorized to do business in Tennessee.

In 1 Reports of American Bar Association, p. 502, is a proposed amendment to section 64b of the Bankrupt Act of 1910, which in part reads: "And (7) debts owing to any person who by the laws of the states or the United States is entitled to priority; Provided, however, that priorities granted by any state law to its residents and to domestic corporations over non-resident and foreign corporations shall not be recognized or allowed."

Again, at pages 490, 491 is the following: "The reasons for this amendment grow out of the fact that there is now existing in Tennessee, and perhaps, in other states, a statute which provides that resident creditors shall have priority in distribution of assets over residents of other states or countries. The U. S. Supreme Court held this act unconstitutional, except in so far as it related to foreign corporations, with the result that a foreign corporation, doing business in Tennessee, is subordinated to all the Tennessee creditors, as was held in Standard Oak Veneer Co. [(D. C.) 173 F. 103], 22 A. B. R. 883. Clearly such an unfair discrimination and preferential outcome should not be perpetuated or left possible."

In the Bankrupt Act, subsection 7 of section 64b, amended in 1926 (11 USCA § 104(b) (7), reads: "(7) debts owing to any person who by the laws of the States or the United States is entitled to priority: Provided, That the term 'person' as used in this section shall include corporations, the United States and the several States and Territories of the United States."

In order to save others some profitless labor, I should say here that I have learned nothing of value from a search of the Congressional Record. See volume 67, pp. 7681, 9609, 9610. As the bill passed the Senate, the proviso to section 64b(7) used the language suggested by the bar association. The House passed the bill with numerous changes, and it went to conference. At the conference, the bar association wording was stricken out, and the wording of the proviso as it appears in the act of 1926 was substituted. So far as I have discovered, no statement of the reason for this substitution was shown in any committee report, and this matter was not discussed on the floor of either house.

In the light of the foregoing, it seems to me an unavoidable conclusion that the intent of the lawmakers was to briefly incorporate the purpose of the bar association as well as to give the United States and the states and territories the rights of individuals as creditors of a Tennessee corporation, or of a corporation admitted to do business in Tennessee.

But entirely without reference to any information as to the amendment as proposed by the bar association, and looking only at the words of the statute as enacted, I can see no reason for avoiding the conclusion that the intent of the statute is to

nullify the foregoing rulings, and to require the courts of bankruptcy, in distributing the proceeds of bankrupt estates, to treat corporate creditors as having the same rights as individual creditors. Unless so construed, corporations are not treated as "persons," and the court would be ignoring the language chosen by the lawmakers.

This conclusion was reached in the case of In re C. D. Hauger Co. (D. C. Tex.) 54 F.(2d) 117. In that case the bankrupt was in the same situation as the bankrupt in the case at bar, but the corporation creditor there was created by the laws of Georgia, and had been qualified to do business in Tennessee. In that single respect the question before Judge Atwell was not exactly the same as the entire question now under discussion. However, the Hauger Case raised the question of the intent of the amendment of 1926 of the proviso, and the opinion is in point here.

To this date I have not found any other case in point.

It follows that the referee's ruling in respect to the Tennessee corporation creditors must be affirmed. This ruling was inadvertently omitted from the referee's order, but his opinion shows clearly that he so ruled.

In this connection it should be said that I have some doubt if Art Wood Carving Company is a corporation. Its proof of claim (No. 13) suggests that it is not. However, the question is unimportant. If the Art Wood Carving Company is merely a name used by an individual, his claim of priority must be denied. I shall state the reason for this conclusion when I reach the E. W. King claim.

## II. The E. W. King Claim.

King is a citizen and resident of Tennessee. The referee denied King's claim to priority, but allowed his claim as an unsecured debt in the amount of $6,983.73. Both King and the trustees of the bankrupt estate have petitioned for review.

1. King's petition for review is based only on the referee's denial of King's supposed right of priority under the Tennessee statute discussed above. The intended beneficiaries of that statute include individual residents of Tennessee as well as corporations created by the laws of that state. By force of Blake v. McClung, supra, 172 U. S. 239, 258, 259, 19 S. Ct. 165, 43 L. Ed. 432, that statute is void as to nonresident individual creditors, whether the creditors claiming the benefits of the Tennessee statute are individuals or corporations; and the Bankrupt Act, as amended in 1926 (section 64b(7), as I read it, gives nonresident corporation creditors the rights of nonresident individual creditors. In the case at bar there are numerous scheduled creditors who are nonresident individuals, as well as numerous nonresident corporations. It seems to me that an individual creditor, who is a resident of Tennessee, has no higher right to priority than has a corporation created by the laws of Tennessee. It follows that the referee's ruling denying King's claim of priority must be affirmed.

2. King's claim is not, eo nomine, for installments of rent accruing after the bankruptcy of the lessee, but is for installments of what he contends is a contract (incorporated in a lease contract) for reimbursement of the cost of improvements made by him to the leased buildings.

The contract between King (lessor) and Boggs-Rice Company (lessee) is unclearly expressed. But at least in one respect the intention of the parties is reasonably clear. It was that the obligation of the Boggs-Rice Company for installments of reimbursements for improvements made by King were to be as contingent as the installments of rent eo nomine.

The most generally accepted reason why installments of rent accruing after bankruptcy are not provable is that the landlord's claim for such installments is contingent. See numerous authorities cited in 11 USCA § 103, note 30, pp. 66 and 67. And I believe that King's claim for reimbursement installments becoming due after bankruptcy is as clearly contingent as would be a claim by him for installments of rent accruing after the petition for bankruptcy was filed. It seems to me fairly clear that the parties did not intend that the reimbursement payments should be made after the tenant had ceased to have the enjoyment of the (improved) premises. In other words, the landlord's right to reimbursement payments was intended to cease if the tenant were evicted by title paramount; or, if the lessee forfeited its enjoyment of the premises by nonpayment of either the rent or the reimbursement installments; or if the buildings were totally destroyed by fire, storm, or otherwise, without negligence on the part of the lessee.

A paragraph of the contract is as follows: "In case the party of the second part should default in payment of rent for as much as sixty (60) days after having received written notice from the parties of

the first part that same is due, in payments of monthly installments of rent and amounts to be paid monthly on money spent for improvements by parties of first part, then the parties of the first part shall have the right at their option to declare the contract forfeited by the party of the second part."

Another sentence reads: "In case of total destruction by fire, storm or otherwise of the property herein leased, without fault or negligence on the part of the party of the second part, this lease shall become cancelled and terminated at the time of such destruction."

There is also a provision for partial destruction; in effect an agreement to agree if both parties should be able so to do.

The contract as a whole, and the foregoing provisions especially, seem to me to make the landlord's claim for reimbursement installments accruing after bankruptcy exactly as contingent as would be a claim by the landlord for installments of rent, eo nomine, falling due after the bankruptcy of the tenant.

Under the contract King was entitled, commencing January 1, 1930, to $83.33 per month without interest on the $10,000 improvement claim. He was also entitled to $1,373.53 for additional sums expended on the improvements. He was paid (Book 5, p. 3) $2,627.67. Subtracting the $1,373.53 from the $2,627.67 leaves $1,254.14, as a credit on the debt of $83.33 per month from January 1, 1930, to June 1, 1932. For this period of two years and six months this debt was $2,500. Subtracting the $1,254.14 therefrom, the result is that as of June 1, 1932, King had an unsecured claim of $1,245.86.

If the receiver appointed by the referee occupied the premises for a time, the landlord's claim for such period should be treated as part of the costs of administration, and it does not concern us here.

The referee's order as to E. W. King's claim must be modified and reduced to $1,-245.86, and as modified affirmed.

### III. The Lincoln Claims.

It will avoid unnecessary confusion to say here that C. C. Lincoln, Jr., is frequently referred to in the evidence as C. C. Lincoln. C. C. Lincoln, Jr., and J. D. Lincoln were virtually in full control of the bankrupt corporation and had been since February 10, 1930. They also controlled the Lincoln Theaters Corporation and the Virginia-Lincoln Furniture Corporation.

(a) I shall first consider the claims put in in the name of J. D. Lincoln to $8,432.38 and to $6,034.

These claims are based on indorsements of notes of the bankrupt, the first payable to the Bank of Bristol, and the last to the First National Bank of Bristol. These claims were sought to be secured by an assignment dated March 30, 1932. (Book 2, p. 6.) Both of these notes were renewals of notes that had previously been indorsed by C. C. Lincoln, Jr. Because the Lincoln brothers regard each as bound by an indorsement made by the other, this deed of trust or assignment to Hendry of March 30th must be treated as having been given for a past consideration. If this assignment had been recorded, it would have precipitated bankruptcy, and I cannot doubt that every one concerned in this transaction so understood. Under the Virginia statute (section 5194, Code 1930), a conveyance of intangibles does not have to be recorded. Kirkland v. Brune, 31 Grat. (72 Va.) 126; Gregg v. Sloan, 76 Va. 497, 500; Daily's Ex'r v. Warren, 80 Va. 512, 523. The only assets that the Boggs-Rice Company could have secretly conveyed were the notes and accounts receivable. When this assignment was made, C. C. Lincoln, Jr., was in Florida. (Book 2, pp. 30, 57.) But in this matter J. D. Lincoln acted as the agent of his brother, as well as for himself. The referee observed the witnesses J. D. Lincoln and Max Rice while testifying, and he knew that C. C. Lincoln, Jr., did not testify. The referee held this assignment to have been made with presumed fraudulent intent, as well as being preferential.

In regard to fraud, the facts put on the beneficiaries a burden of evidence. See Hickman's Ex'r v. Trout, 83 Va. 478, 3 S. E. 131; 27 Corpus Juris, 788, § 715; Stuart v. Larsen (C. C. A.) 298 F. 223, 228; Hertzmark v. Lynch (C. C. A.) 54 F. (2d) 38, 40. The referee thought that this burden had not been successfully borne. I do not feel entirely free to disagree with the referee on this question; but I cannot escape the belief that this assignment was at least constructively fraudulent.

It has been held in a long line of Virginia cases, cited in Mathews v. Bond, 146 Va. 158, 164, 135 S. E. 689, that a deed of trust on a stock of merchandise remaining under control of the grantor is "fraudulent per se," that is constructively fraudulent, and void. When the assignment of March 30th was made, it was fully intended that the notes and accounts should remain in the

unfettered control of the bankrupt. Not even a list of these receivables was made, and it was never intended to be made.

In principle, there is a close analogy between an effort to affix a lien on a shifting stock of merchandise and on a shifting collection of notes, reservations of title to furniture, and accounts receivable.

In Union Trust Co. v. Peck (C. C. A. 4) 16 F.(2d) 986, 987 [affirming (D. C.) 13 F.(2d) 152] Judge Rose said: "In that case we assumed, without discussion, that it was well settled that the law of Maryland, like that of New York, would not sustain assignments under which the nominal assignee [assignor] retained unfettered dominion over the property which he professed to assign, and that the things the assignee and assignor did were more significant than what they said they were going to do."

In Daily's Ex'r v. Warren, 80 Va. 512, 523, it was said: "There was and is no law in Virginia, requiring the assignment of a chose in action to be recorded. * * * Assignee of chose in action is not required to do more than take possession of the thing or evidence of debt assigned."

In the case of Re Almond-Jones Co. (D. C.) 13 F.(2d) 152, 154, supra, Judge Soper said: "The validity of the assignment depends upon whether or not the actual arrangement between the bankrupt and the bank was such that the bankrupt retained unfettered dominion over the assigned accounts and their proceeds."

In Benedict v. Ratner, 268 U. S. 353, 364, 365, 45 S. Ct. 566, 569, 69 L. Ed. 991, it was said in speaking of the law of New York: "In the case at bar the arrangement for the unfettered use by the company of the proceeds of the accounts precluded the effective creation of a lien and rendered the original assignment fraudulent in law." See, also, In re Saxon Coffee Co. (D. C.) 22 F.(2d) 999 by Judge Soper.

The fact which discriminates Parker v. Meyer (C. C. A. 4) 37 F.(2d) 556, from the case at bar is thus stated in the opinion: "As security for this indorsement, the bankrupt turned over to the bank for the benefit of Meyer leases and conditional contracts at least equal to the amount of the discounted note."

On the whole, I must regard the Hendry deed of trust of March 30, 1932, as at least constructively fraudulent and void.

I further concur in the referee's conclusion that this assignment was preferential.

I am entirely unable to avoid the conclusion that the bankrupt was on March 30, 1932, insolvent within the meaning of the Bankrupt Act § 1(15), 11 USCA § 1(15), and the further conclusion that J. D. Lincoln then had reasonable cause to believe that this assignment would effect a preference.

In Musk v. Burk (C. C. A. 7) 58 F.(2d) 77, 79, is a recent restatement of a well-settled rule: "That a preferential transaction shall be deemed voidable does not require that the person to be benefited should know that the result of the transaction would be to effect a preference, but it will be sufficient if the person preferred, or his agent therein, have knowledge or notice of facts and circumstances that would incite a person of reasonable prudence under similar circumstances to make inquiry, as he is thereby charged with notice of all the facts which a reasonably diligent inquiry would develop."

In Pender v. Chatham Phenix Nat'l Bank & Trust Co., 58 F.(2d) 968, 970 (C. C. A. 2), it is said: "In preference cases, notice of facts which would incite a man of ordinary prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would have disclosed. See Wright v. William Skinner Mfg. Co., 162 F. 315, 317 (C. C. A. 2); Boston Nat. Bank v. Early, 17 F.(2d) 691, 692 (C. C. A. 1); Ridge Avenue Bank v. Studheim, 145 F. 798 (C. C. A. 3); Shale v. Farmers Bank, 82 Kan. 649, 109 P. 408." See, also, Fischer v. Liberty Nat'l Bank & Tr. Co. (D. C.) 53 F.(2d) 856, 857; Buchanan State Bank v. DeGroot (C. C. A.) 39 F.(2d) 397; McGee v. Branan & Carson Co. (D. C.) 2 F.(2d) 758.

The two items in question are based on an indorsement by J. D. Lincoln of a note for $8,432.38, payable to the Bank of Bristol, and a note for $6,034, payable to the First National Bank of Bristol. That either of these notes has been paid does not appear. I have found no proof of claim by the receiver of the Bank of Bristol for the item of $8,432.38 and none by the First National Bank of Bristol for item of $6,034.

An indorser on a note made by a bankrupt, unless the indorser has paid the note, cannot in his own name file a proof of claim. Until the indorser has paid the note, it is the payee who has the provable claim, and the claim of the indorser is contingent. Phillips v. Dreher Shoe Co. (D. C.) 112 F. 404, 406; In re Dr. Voorhees

Awning Hood Co. (D. C.) 187 F. 611, 633, 634; In re Astoroga Paper Co. (D. C.) 234 F. 792, 795; J. S. Farming Co. v. Brannon (C. C. A.) 263 F. 891; In re Hanson & Tylor Auto Co. (D. C.) 286 F. 161; 2 Collier (13th Ed.) 1163, 1165.

Section 57i, Bankrupt Act, 11 USCA § 93(i), and General Order 21(4), 11 USCA § 53, authorize an indorser, where the payee has not filed a claim, to file in the name of the payee.

The proof of claim, in the form of a petition in the name of J. D. Lincoln, verified August 5, 1932, and an affidavit by J. P. Buchanan, attorney for J. D. Lincoln, was, I assume, filed in due time; although there is no indorsement on either showing the date of filing.

█ The error in failing to file proofs of claim in the names of the banks can be now cured by amendment. See 11 USCA § 93 (n), note 6, p. 300. Moreover, actual amendment would be unimportant, provided that the dividends on these two unsecured claims are paid to the respective payees of the two notes.

█ I shall affirm the referee's ruling that the claim filed in the name of J. D. Lincoln to $8,432.38 is an unsecured claim; but any dividends on this claim must be paid to the agent of the receiver of the Bank of Bristol, as a credit on the note evidencing this debt.

I shall also affirm the referee's ruling that the claim filed in the name of J. D. Lincoln for $6,034 is an unsecured claim; but the dividends thereon should be paid to the First National Bank of Bristol, as a credit on the note evidencing this debt.

(b) The J. D. Lincoln claim of $2,000:

█ Notwithstanding the fact that J. D. Lincoln did on April 29, 1932, promise to lend the bankrupt $2,000 on condition that he be secured, which promise was made good on June 2d, I must hold that the assignment of receivables (Book 2, p. 7) dated April 30th is constructively fraudulent. When this assignment was made, the receivables were intended to be and were left in the unfettered dominion and control of the bankrupt. Moreover, I believe this loan was made with intent to defeat the operation of the bankrupt act; the loan was made to keep the stores open long enough, as I believe, to allow time for the Repass deed to be made and for the furniture corporation matter to be attended to. These two transactions will be next considered.

█ I now reach the instrument dated May 3, 1932, to Repass, trustee. (Book 2, p. 18.)

This instrument omits all the assets of the Boggs-Rice Company located at Appalachia, Va. This omission could not easily be ascribed to inadvertence; and the most probable reason for the omission was a fear of transgressing the Virginia statute (section 5278b, Code 1930, Acts of 1924, p. 657) forbidding preference in assignments for the benefit of creditors. This statute has been recently considered in the case of Pilson v. Rodeffer, by the Circuit Court of Appeals of this circuit, 61 F.(2d) 976, opinion dated November 28, 1932.

The stocks of furniture in bankrupt's remaining stores were omitted, as including them would have made the deed fraudulent per se. See Mathews v. Bond, supra, 146 Va. 158, 164, 135 S. E. 689.

Except as above stated, the Repass deed does include practically all of the bankrupt's assets, except receivables due within thirty days.

In respect to tangible personal property, recording is essential to validity of a deed of trust but only in respect to lien creditors. See section 5194, Code 1930, Acts 1922, p. 474.

The Repass deed was admitted to record in Bristol, Tenn., on May 13, 1932, in Bristol, Va., and in Washington county, Va., on the same date; in Smyth county, Va., on May 14th, and Wythe county on May 18, 1932. The lien of the trustees of the bankrupt's estate did not arise until the petition for bankruptcy was filed on May 31, 1932.

The Repass deed was intended to again secure the $25,000 note of the bankrupt to Marion National Bank, indorsed by C. C. Lincoln, Jr.; to again secure the $2,000 loan made by J. D. Lincoln on May 2d; and to secure for the first time a demand note by the bankrupt payable to bearer for $25,320.13.

This aggregate is composed of the following items, according to a statement dictated by Mr. Buchanan. (See Book 3, pp. 76, 77.)

| Feb. 11th, 1932, | $5,000. |
|---|---|
| April 5th, " | 4,500. |
| April 11th, " | 5,000. |
| April 18th, " | 2,000. |
| May 3rd, " | 8,820.13 |
| | $25,320.13 |

Is the Repass deed fraudulent?

The facts concerning this instrument are surprisingly meager. It was executed in J. P. Buchanan's office in Marion, on May 3, 1932. At whose instance it was made does not appear. Whether or not either of the Lincolns was then present cannot certainly be learned from the evidence. Probably J. D. Lincoln was not. He says (Book 2, p. 42) that he was in California "during May." See, also, Id. p. 49. Where C. C. Lincoln, Jr., was on May 3d I do not certainly know. He was in Florida on March 30th. (Book 2, p. 30; Book 3, p. 57.) He was in Marion on May 11th. (Book 3, p. 42, Minute Book p. 133.) He was in Bristol on May 31st. But where he was on May 3d cannot be learned from the evidence.

But in any event the Repass deed was made at the behest of either C. C. Lincoln, Jr., or of Mr. Buchanan, the attorney of the Lincolns.

This deed was made in such circumstances that the beneficiaries were under a heavy burden of evidence to show good faith. C. C. Lincoln, Jr., never testified. J. D. Lincoln, if in California at the time, could give little or no information, and his evidence in respect to the Repass deed is practically nil. Mr. Buchanan did not testify. Certainly this burden of evidence was not sustained. On May 3d, J. D. Lincoln had not, as I believe, authorized any one to charge him and credit the bankrupt on the books of the Virginia-Lincoln Furniture Corporation with the item of $8,820.13. What J. D. Lincoln said (Book 2, p. 48) in speaking of the demand note for $25,320.13 payable to bearer, is: "I actually authorized the payment of most of that." I must believe that the reason for making the note for $25,320.13, payable to bearer, was uncertainty as to what J. D. Lincoln might do in respect to the item of $8,820.13.

On May 3d the bankrupt was indubitably insolvent within the meaning of the Bankrupt Act, and I am convinced that every one concerned in this transaction not only knew that fact, but believed that bankruptcy was inevitable. This deed was made, as I believe, with intent to defeat the purpose of the Bankrupt Act.

Every case of fraudulent conveyance depends on its own facts. After full study of the evidence here, I fully concur in the referee's conclusion that the Repass deed is fraudulent. The evidence seems to me to show that this instrument was made with intent to unlawfully hinder, delay, and hence to defraud the other creditors. It was certainly not made "in good faith with a view to benefit of the company, as well as of its creditors," and it was made "solely with a view to the benefit" of the Lincolns.

In Richardson's Ex'r v. Green, 133 U. S. 30, 43, 10 S. Ct. 280, 284, 33 L. Ed. 516, is the following: "Undoubtedly his relation as a director and officer, or as a stockholder of the company, does not preclude him from entering into contracts with it, making loans to it, and taking its bonds as collateral security; but courts of equity regard such personal transactions of a party in either of these positions not, perhaps, with distrust, but with a large measure of watchful care, and unless satisfied by the proof that the transaction was entered into in good faith, with a view to the benefit of the company as well as of its creditors, and not solely with a view to his own benefit, they refuse to lend their aid to its enforcement."

The foregoing is as sound and as binding now as it was in 1889 when it was written.

The facts in the case at bar more closely resemble those in Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419, than in Coder v. Arts, 213 U. S. 223, 29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008, or in Van Iderstine v. Nat'l Discount Co., 227 U. S. 575, 33 S. Ct. 343, 57 L. Ed. 652.

But, even if the Repass deed were not fraudulent, I fully concur in the referee's opinion that the beneficiaries had reasonable cause to believe that this deed would effect a preference. I hold it to be void.

(c) The Lincoln Theaters claim of $25,000:

This is the third claim mentioned in the Repass deed, and also one of the claims that was sought to be secured by the assignment of March 30, 1932.

In 1930, on the strength of the indorsement of C. C. Lincoln, Jr., the Marion National Bank loaned to the Boggs-Rice Company $25,000. This note was supplanted several times by renewals also indorsed by C. C. Lincoln, Jr. Who owned the claim on May 31, 1932, the day the petition for bankruptcy was filed, seems to me unimportant. This debt was on June 2d represented by a note for $25,000, payable to Marion National Bank, and indorsed by C. C. Lincoln, Jr., and J. D. Lincoln. In strictness the proof of claim should, I believe, have been filed by C. C. Lincoln, Jr., in the name of the Marion National Bank. The claim made in the name

of the Theaters Corporation could be amended; but, if the dividends on the unsecured claim are paid to the Marion National Bank, as credits on the $25,000 note now held by that bank and indorsed by the Lincolns, all that is necessary will have been done. Subject to this condition the referee's ruling, holding this claim unsecured, should be affirmed.

## IV. The Virginia-Lincoln Furniture Claim of $27,500.

This corporation manufactures furniture. It is, so far as we are now concerned, another name for the Lincolns. By an undated contract, made on February 10, 1930 (Book 1, insert between pages 84 and 85), by and between the then only stockholders of the Boggs-Rice Company, it was agreed that an amendment to the charter of the last-named company would be obtained allowing the issue of preferred 7 per cent. cumulative stock; and that the furniture corporation would sell furniture to the Boggs-Rice Company for preferred stock at par and accrued and unpaid dividends. Commencing in April, 1930, from time to time until December 31, 1931, preferred stock had been issued to the furniture corporation for furniture to the amount of $27,500. See Preferred Stock Certificate Book.

On May 11, 1932, erroneously typed March 11th (Minutes, p. 131), at a meeting of the stockholders of the bankrupt, the following resolution was passed: "On motion, the Board of Directors was authorized to manage the affairs of the Corporation in their discretion during the succeeding year, with power to delegate any or all of their powers or duties to any officer or officers with full authority to act, and such acts are ratified and approved."

At the immediately following meeting of the board of directors of the bankrupt (Minutes, p. 133) Rice was elected president and J. P. Buchanan secretary. And then a resolution was adopted which in part reads: "Be it resolved by the Board of Directors of Boggs-Rice Company, Incorporated that the President and Secretary be, and they are hereby jointly authorized and empowered in their discretion to manage and control the affairs of the corporation; to retire and exchange stock and issue in lieu thereof securities and obligations of the corporation; to make, sign, execute, deliver and acknowledge any and all contracts, papers, notes, obligations, and instruments which in their judgment are advisable for the interests of the corporation and attach the corporate seal thereto when necessary."

It will be recalled that the three assignments heretofore discussed had been already made. I quote the following from Rice's testimony at page 61(74) of Book 1 of the evidence:

"Q. You and Mr. Boggs were well aware of the financial condition of the company when the meeting was held on May 11th, 1932? A. Yes, I was. * * *

"Q. Was the financial condition discussed at the meeting of the stockholders or directors? A. Yes. Some discussion.

"Q. Good or bad? A. Well, I would call it certainly not good, because we were certainly being pushed by the banks, and claims were being put in the hands of attorneys, and the banks calling those notes. * * *

"Q. Mr. Lincoln knew of the condition of the Company? A. Yes.

"Q. He was there and heard the discussion of the meeting? A. Yes."

The Mr. Lincoln referred to is C. C. Lincoln, Jr.

On the following day the $27,500 of preferred stock held by the Virginia-Lincoln Furniture Corporation was exchanged for two demand notes, payable to bearer, one for $20,000 and the other for $7,500, executed by the bankrupt and indorsed "pay to Marion National Bank" by the furniture corporation.

On May 11th the bankrupt was insolvent in every sense of the word, and I am convinced that the directors not only knew this to be a fact, but that they knew bankruptcy was inevitable and close at hand. The intent of the board of directors was to transform a favored stockholder into a creditor, at the expense of the genuine creditors. I am clearly of opinion that the board had no power so to do, and that their action was a clear breach of trust.

In Planters' Bank of Farmville v. Whittle (1884) 78 Va. 737, 740, it was said: "That the directors of a corporation are bound to act in discharge of their duties with prudence, vigilance and fidelity, and to apply its assets, in the event of insolvency, for the benefit of the creditors in preference to the claims of stockholders or other persons, is a proposition which is not, and cannot be, disputed."

Nothing else said in that opinion is in the least applicable here. At that time there was no Bankrupt Act. The act of 1867 (14

Stat. 517) was repealed in 1878 (20 Stat. 99), and preferences were not forbidden by the state law. Every word of that opinion may be accepted as sound; and still it is authority for the statement that in Virginia the trust fund doctrine obtains "in the event of insolvency."

In Kennerly v. Columbia Chemical Corp'n, 137 Va. 240, 246, 119 S. E. 265, 267, it was said: "In some jurisdictions it is held that a corporation cannot purchase its own stock, for the reason that such a transaction is held to be ultra vires. But in Virginia, and by the weight of authority, a corporation, in the absence of charter or statutory provisions, may purchase its own stock, provided it acts in good faith."

In Grace Securities Corp'n v. Roberts, 158 Va. 792, 800, 164 S. E. 700, 703, in which there was no "invasion of the rights of creditors or stockholders," it was said: "There are current two inconsistent doctrines on the subject. One is that it is inherently illegal, in the absence of statutory authority, for a corporation to purchase its own stock. The other is that a corporation may buy its own stock, if the interest of creditors be not adversely affected, and if its power to buy be not restricted by its charter or by the general law."

In Chicago, R. I. & P. Railroad Co. v. Howard, 7 Wall. 392, 409, 410, 19 L. Ed. 111, it was said: "Equity regards the property of a corporation as held in trust for the payment of the debts of the corporation, and recognizes the right of creditors to pursue it into whosesoever possession it may be transferred, unless it has passed into the hands of a bona fide purchaser; and the rule is well settled that stockholders are not entitled to any share of the capital stock nor to any dividend of the profits until all the debts of the corporation are paid."

In Sawyer v. Hoag, 17 Wall. 610, 623, 21 L. Ed. 731, it was said: "It is, therefore, but just that when the interest of the public, or of strangers dealing with this corporation is to be affected by any transaction between the stockholders who own the corporation and the corporation itself, such transaction should be subject to a rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled so far as it may inequitably affect him." See, also, 7 R. C. L. 198, 199.

There was an effort made not only to put the furniture corporation in the position of a creditor, but of a secured creditor. This document (Book 3, pp. 71, 72) was not put in evidence until counsel for the trustees of the bankrupt estate put it in. Its invalidity is too apparent to need discussion.

 The contention made in behalf of the furniture corporation that a breach of trust cannot be treated as such by a court of bankruptcy, because such wrongs are not specifically and expressly denounced by the Bankrupt Act, is unsupported by authority, and is, in my belief, utterly unsound.

The referee's ruling wholly rejecting the claim of the Virginia-Lincoln Furniture Corporation must be affirmed.

### V. The W. J. Boggs Claim.

 This claim to $25,000, subject to a credit of $1,035, is based on a letter of very unusual character, written, I believe, on February 1, 1929. See Book of Evidence 1, pp. 48–50. This document was dictated by C. C. Lincoln, Jr., at least Boggs so testified, and there is no contradiction of this fact in the evidence. On its face, the instrument was to become a valid and binding contract when signed by C. C. Lincoln and Max Rice and accepted by Boggs. It was never signed by either Lincoln or Rice.

This letter was addressed to W. J. Boggs and was signed: "Boggs-Rice Company by W. J. Boggs, President." It was not, until May 11, 1932, signed by J. P. Buchanan, secretary, or sealed.

The letter indicates that Boggs' bad health was the sole cause of his retirement as president of the Boggs-Rice Company.

Boggs had been president of the Boggs-Rice Company since January 13, 1927. (Minutes 40.) On February 10, 1930, the Virginia-Lincoln Furniture Corporation became the owner of 51 per cent. of the common stock of the Boggs-Rice Company. On March 3, 1931 (Minutes 104), a resolution was adopted declaring it inadvisable to declare a dividend on the common stock. In August or September, 1931, C. C. Lincoln, Jr., had threatened Boggs with removal from the presidency of the Boggs-Rice Company. The letter now under consideration was a consummation of Lincoln's purpose to force the retirement of Boggs.

In effect, the purpose shown by the letter was that Boggs should be allowed to exchange his 309 shares of common stock

for the same number of shares of preferred stock, and that the bankrupt should pay Boggs $25,000 for the preferred stock in installments during a period of over ten years.

The letter closes with the statement: "This agreement has been approved and authorized by the directors of the Boggs-Rice Company, at a meeting held on January 29th, 1932."

If there was such meeting, there has been a spoliation of the Minute Book. Pages 107 to 130, both inclusive, which would have contained the record of such meeting, if held, are missing. However, I believe that there was no such meeting, and Boggs' silence on this subject goes far to confirm my belief.

In the minutes of a directors' meeting (Minute Book 135) held on May 11, 1932, is the following: "On motion of W. J. Boggs, seconded by C. C. Lincoln, Jr., the acts of the officers of the corporation in and about its business during the preceding year were ratified, approved and confirmed as the acts of the corporation."

This resolution further tends to support the belief that there had not been any action by the board of directors on January 29th.

The legal effect of this attempted ratification will be discussed further along. But until May 11th, at least, I cannot hold that there ever had been a contract, binding on the bankrupt, to purchase Boggs' stock. The letter, if it ever bound any one, was an attempt by two directors (C. C. Lincoln, Jr., and Max Rice), acting in pais, to bind the bankrupt company. It goes without saying that Boggs, as president, had no power to make a contract with himself. It is elementary that two of a board of five or six directors, acting in pais, cannot bind the corporation. See 7 R. C. L. 439, § 427; 14a Corpus Juris, 84, § 1844.

I think it an unavoidable conclusion that, at least until May 11th, Boggs had no contract.

The effort made on May 11th to ratify the supposed contract with Boggs was, I believe, ineffective. At that date the board of directors could not have made a valid contract with Boggs whereby the bankrupt could bind itself to purchase his stock. At least the majority of the board, if not all of the board, knew that the company was utterly insolvent, and that bankruptcy was inevitable and near at hand. An intent to adversely affect the interest of the unsecured creditors

certainly then existed. The Lincolns and the Lincoln Theaters Corporation were then supposed to have been secured, and it only remained to alter the status of the Virginia-Lincoln Furniture Corporation from stockholder to creditor, which was attended to the next day.

In U. S. Min. Co. v. Camden, 106 Va. 663, 665, 56 S. E. 561, 117 Am. St. Rep. 1028, it was said: "In the absence of charter or statutory prohibition, it is well settled, indeed the prevailing doctrine in the United States, that corporations may purchase, hold, and sell shares of their own stock, provided they act in good faith and without intent to injure their creditors." See, also, Kennerly v. Columbia Chemical Corp'n, 137 Va. 240, 246, 119 S. E. 265.

In Grace Securities Corp'n v. Roberts, supra, 158 Va. 792, 800, 164 S. E. 700, 703, it was said that " * * * a corporation may buy its own stock, if the interest of creditors be not adversely affected. * * *"

As the board had on May 11th no right to make a contract with Boggs for the purchase of his stock, the board had then no power to give validity to a previous intent to contract, if there ever was such intent. The question of the power of the board was not one between Boggs and the bankrupt; but between the bankrupt and the unsecured creditors of the bankrupt. The attempted ratification was made in bad faith and with intent to adversely affect the unsecured creditors, and was made too late.

I must affirm the referee's ruling rejecting Boggs' claim in toto.